## DIMENSTEIN v. NEW ENGLAND MUT. LIFE INS. CO. OF BOSTON, MASS.

### No. 10600.

Circuit Court of Appeals, Fifth Circuit.

Nov. 3, 1943.

Rehearing Denied Dec. 6, 1943.

James L. Permutt, Griffith R. Harsh Jr., and Francis H. Hare, all of Birmingham, Ala., for appellant.

Borden Burr, of Birmingham, Ala., for appellee.

Before SIBLEY, McCORD, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

Finding that the policy had lapsed for nonpayment of premiums, the court below directed a verdict against the appellant, in her suit on an $8,000 policy of insurance on the life of her husband wherein appellant was the beneficiary. The policy was issued on April 13, 1938, in consideration of the payment of an annual premium of $204 with the privilege of paying the premiums in quarterly installments plus six per cent. interest in lieu of the lump sum payment. Assured elected to pay on the quarterly basis and managed, by the use of the soliciting agent's credit and the use of a $37.44 dividend, to pay the first five quarterly installments. He failed, however, to pay the quarterly installments that fell due on July 13, October 13, and January 13, in the second year of the policy, and died on January 23 of that year. Grace periods of thirty-one days were permitted for the payment of any premium, quarterly or otherwise. His death was within the grace period permitted under the January 13, 1940, quarterly installment.

If kept in force for two years the policy would have had a cash or loan value of $152.48 Failure to pay any premium or premium note when due or during the per-

iod of grace caused the policy to cease to be in force and have no value except as provided by the nonforfeiture and loan provisions.

It was provided that upon the payment of the second annual premium, each year thereafter, while the policy was in force, the policy would be credited with such share of the surplus as was apportioned by the company, and which surplus, at the option of the holder of the policy, should be payable: (A) in cash; (B) applied in reduction of premiums; (C) used to purchase a paid-up participating addition; or (D) left with the company to accumulate with interest; and that if no election was made the share for that year would be held by the company as provided in option (D), but that if any premium remained unpaid the company would apply the accumulated surplus, if sufficient to make said payment in full, to the payment of unpaid premiums. But no surplus had been apportioned by the company during the second year of the policy in question.

The following provisions in the policy relating to premium loans produce the main controversy: "After one full annual premium has been paid, and while this Policy is in force, upon receipt of the loan agreement, duly executed, pledging the Policy, and until otherwise directed, the amount of any premium which thereafter becomes due and remains unpaid will be charged against the Policy as a premium loan, with interest at six per cent per annum, provided the entire indebtedness on the Policy with interest shall not exceed the cash value."

The policy also provided that after two full annual premiums had been paid, the holder, within thirty-one days after default in payment of a subsequent premium, could elect, in writing: (a) to surrender the policy and receive in cash the value of the policy, less any indebtedness; (b) to take participating paid-up insurance for such amount as the cash value of the policy would purchase as a net single premium; (3) to have the policy continued as paid-up insurance for such term as the then cash value of the policy, less any indebtedness, would purchase as a net single premium.

None of these last three options were available to the insured because the second annual premium had not been paid in full. The policy had not been in force two years at the time of the default in the payment of the premiums, nor at the time of his death. However, appellant contends that under the premium loan provisions quoted above the policy had a value which was sufficient to carry the policy until after the date of the death of the insured, or that it was at least sufficient to cover the second and third quarterly premiums of July 13 and October 13 respectively, and that the insured died within the grace period of the fourth quarter-annual premium of the second year.

This contention is predicated upon the premium loan provisions of the policy and the offer of the company to make a premium loan of $143 to the assured for the purpose of paying the remainder of the second annual premium, provided the assured would pay in cash the sum of $8.84. The total of the premium loan note of $143, plus $8.84, added to the $52.16 paid for the first quarterly premium of that year, totaled $204, the amount of the annual premium. The assured did not execute the loan agreement nor return the policy nor pay the $8.84, nor did he ever pay any of the quarterly premiums of the second year except the first.

Appellant insists that assured had the right to pay the premiums quarterly and that the proposal by the company to make the loan and to exact the $8.84 in cash would have required the assured to pay the premium annually, contrary to the contract, and that the assured had the right to take advantage of the loan provisions for the payment of any premium, quarterly or otherwise, notwithstanding the provision of the policy, relative to premium loans, that the indebtedness should not exceed the cash value of the policy.

It is evident that the policy had no cash surrender value, or all-purpose loan value (as distinguished from premium loan value), at the time of the failure to pay the July quarterly premium, for the policy had been in effect only eighteen months, instead of the requisite two years.

It appears from the testimony of an actuary produced by the plaintiff that prior to the expiration of two years such a policy would have an interpolated, or reserve, value and that at the end of the first premium year the policy would have a reserve, or interpolated, value of $11.75 per thousand, and that such value would increase at the rate of approximately $3 per quarter during the second year. We need not concern ourselves as to the total interpolated value at the end of the second year be-

cause that time was not reached. The interpolated, or reserve, value at the time the sixth quarterly premium became due, according to the actuary, was approximately $17.85 per thousand, making a total of $142.00 of reserve, or interpolated, value for the $8,000 policy, in which situation the additional sum of $8.84, which the company provided should be added to this interpolated value, would have totaled the balance of the entire premium for the second year of $204.

The proposal of the company to make the premium loan was satisfactory to the insured and an appropriate premium note was forwarded to him, but he never executed it, nor sent in the policy, nor paid the $8.84. Doubtless, he would have had the right to have borrowed, for premium purposes only, any portion of the $142 of reserve, or interpolated, value at the time that his July 13 premium was due, but he made no such request. Instead he instructed the local or soliciting agent to go ahead and effectuate the proposal to lend him a sufficient amount, when $8.84 in cash was paid by him, to pay the premium for the balance of the year. Not having requested of the company or its agent a loan sufficient only to pay the sixth quarterly premium, but on the contrary having acquiesced in the proposal made by the company, which he failed to comply with, it seems clear that he elected to allow his policy to lapse.

The premium loan provision was not automatic. The reserve, or interpolated value, was not available for any loan, except to pay premiums, nor did it have a cash surrender value, and it was available for premium payments only upon receipt of the loan agreement, duly executed, pledging the policy, provided the loan did not exceed the cash value of the policy. In view of the proposal of the company to make the premium loan when the policy had no actual cash value or cash surrender value until after the policy had been in force for two full years, and in view of the undisputed testimony of the actuary that the policy did have a reserve, or interpolated, value, it would appear that the use of the term "cash value" in the premium loan provision of the policy was inaccurate, or else the offer of the company to make the loan when the policy had no cash value was a concession by the company beyond the express provisions of the policy. The pol-

icy does not read: "Provided the indebtedness shall not exceed the cash value or 'reserve, or interpolated, value'". Under the strict wording of the policy the insured was not entitled to demand a premium loan prior to the end of two full years because the policy had no cash value prior to that time, but only a reserve, or interpolated, value. The loan which the company offered to make would have been based on the reserve, instead of the cash, value of the policy, and if the loan had been made the indebtedness would have exceeded the cash value as that term is elsewhere used throughout the policy. However, this is unimportant because the assured did not avail himself of the offer made nor did he request the right to execute a premium note only for the amount of the quarterly premium then due. No other conclusion can be reached but that he abandoned his policy.

The lower court was without error in directing a verdict for the defendant and the judgment is affirmed.